In re Joseph R. RIGNEY, Mary
H. Rigney, Debtors.

Joseph R. RIGNEY, Plaintiff,

v.

UNITED STATES of America, Alabama
Department of Revenue,
Defendants.

Bankruptcy No. 95–06142–TOM–7.
Adversary No. 96–00041.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

July 31, 1997.

Benjamin Abney, Atlanta, GA, for Joseph
Rigney.

Janice Feldman, Washington, DC, for IRS.

## MEMORANDUM OPINION AND ORDER

TAMARA O. MITCHELL, Chief Judge.

This adversary proceeding is before the
Court following a trial on the merits of the
Complaint of Joseph R. Rigney [1] against the

1. Mary Rigney was initially also named as a
plaintiff in this proceeding but a judgment on the
pleadings was rendered in her favor on August 9,
1996. The trial was on the limited issue of the
dischargeability of the taxes for the years 1986,
1987, and 1988 under 11 U.S.C. § 523(a)(1)(C).

United States of America Internal Revenue Service (IRS).[2] Appearing at the July 8, 1997, trial were Benjamin Abney, attorney for Mr. Rigney, and Janice Feldman, attorney for the IRS. This Court has jurisdiction. 28 U.S.C. § 1334(b). This is a core proceeding. 28 U.S.C. § 157(b)(2)(I). The Court has considered the pleadings, the testimony, the documentary evidence, the arguments of counsel—both at the trial and in pretrial documents—and the law and finds and concludes as follows.[3]

## FINDINGS OF FACT

Mr. Rigney was the owner and sole-shareholder of Scouting Report, Inc. (SRI). SRI was in the business of promoting high school athletes to colleges in attempt to obtain scholarships for those athletes. The athletes paid a fee to SRI for this service. Additionally, SRI sold franchises or territories of the business to other individuals. Mr. Rigney has a high school education with some college work. Prior to starting SRI, he worked primarily as a pressman at a printing company. He has had no special accounting or legal training. Dick Evans was employed by SRI as the bookkeeper. He also prepared the tax returns for both Mr. Rigney[4] individually and for SRI and had full access to all of their financial documents.

In January of 1990, the IRS began an audit of both Mr. Rigney and SRI. The audit covered the corporate and individual returns for 1986, 1987, and 1988. The IRS ultimately claimed that Mr. Rigney understated his personal income in the following amounts in the years indicated:

| Year | Understatement claimed |
|------|------------------------|
| 1986 | $61,456.00 |
| 1987 | $ 3,469.98 |
| 1988 | $61,692.62 |

The IRS arrived at these numbers by the "indirect method." In this method, the IRS analyzed Mr. Rigney's personal bank accounts to monitor the debits and the credits. The income from reported sources was then subtracted from the amounts paid out in personal expenditures each year. Any positive difference would indicate that Mr. Rigney had received income from an unreported source to cover the expenditures made. For example, in 1987 Mr. Rigney had reported income from all sources of $78,673.66 including his salary, Ms. Rigney's salary, interest, and cash on hand at the beginning of the year. During that year, he paid out $82,143.64. According to the IRS, this means that Mr. Rigney must have had $3,469.98 in unreported income in order to have met his expenses.

The IRS also felt that certain "loans to shareholders" which were reflected on the books of SRI were actually either dividends to Mr. Rigney or direct compensation to him. In either case, the IRS felt that the following amounts constituted additional taxable income of Mr. Rigney:

| Year | Dividend amount |
|------|-----------------|
| 1986 | $ 1,594.42 |
| 1987 | $ 52,303.78 |
| 1988 | $131,085.20 |

The IRS additionally contends that SRI paid personal expenses of Mr. Rigney in the following amounts which should also be counted as taxable income:

| Year | Expense paid |
|------|--------------|
| 1986 | $ 39,170.74 |
| 1987 | $ 60,214.50 |
| 1988 | $116,906.73 |

The IRS determined that as a result of all of the claimed understatements of income and dividends, Mr. Rigney had understated the

---

The motion for partial summary judgment on the dischargeability of the taxes for 1990 is being held in abeyance pending a ruling from the United States District Court for the Northern District of Alabama in another case involving the same issue of law.

2. The Alabama Department of Revenue is also a named defendant in this adversary proceeding but failed to appear and defend this proceeding after being properly served. A judgment has been rendered against them by separate order of this Court.

3. This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

4. Mr. and Ms. Rigney actually filed joint returns. However, since it is only the income attributed to Mr. Rigney on those returns which is in question, this opinion will refer to "Mr. Rigney's return" as if he had filed separately from his wife.

amount of his tax liability by the following amounts:

| Year | Understatement of tax liability |
|------|--------------------------------|
| 1986 | $36,804.00 |
| 1987 | $38,818.00 |
| 1988 | $91,671.00 |

Penalties and interest were added to these amounts.

Mr. Rigney and his accountant Dick Evans dispute that there was an understating of income by Mr. Rigney in any of the years in question. They testified that the majority of the money which the IRS attributed to unreported income actually came from the "loans" from SRI to Mr. Rigney. The "loans" were noted on the books of SRI but no other documentation was created. Mr. Evans said that he had seen this done in many other small corporations and that the practice had never before been questioned to his knowledge. Mr. Evans did not feel that this money was properly counted as income since he did not consider it to be salary or dividends and since Mr. Rigney was obligated by the notation on the books to repay it. Mr. Rigney relied on the opinion of Mr. Evans in this regard.

As to the expenses which the IRS claims were improperly paid by SRI, Mr. Evans testified that when he entered the checks on the books, if Mr. Rigney could not provide documentation that it was a legitimate business expense, he noted it as a "loan." Mr. Evans pointed out several such "loan" notations in the records entered as Plaintiff's Exhibit 51. Both Mr. Rigney and Mr. Evans testified that Mr. Rigney relied on the advice of Mr. Evans in determining how to report and classify these "loans." They both also testified that Mr. Rigney's policy was to err on the side of counting items as income when there was any question. Mr. Evans added that he felt so sure that he was *overcharging* Mr. Rigney for loans for expense items that he had another accountant audit the books. As to the substantial "loans" which Mr. Rigney took, he testified that he took the "loans" because SRI was making a large profit and he expected to sell the business soon. He testified that he planned to repay the "loans" with the sales proceeds.

The testimony presented by the IRS concentrated on three specific items. One was a check to Mr. Rigney from SRI for $16,000.00. Mr. Rigney stated, at the trial and to the IRS at the audit, that this check was to pay him back for refunding that amount to Mary Jolly. Ms. Jolly had been an initial investor in SRI but had wanted her money returned. Mr. Rigney gave her a cashiers check for her investment amount and SRI repaid him. He testified that he was not sure whether he paid her first or whether he got the money from SRI and then bought the cashiers check. Mr. Rigney submitted a copy of a cashiers check to Mary Jolly. Plaintiff's Exhibit 49. The Court finds Mr. Rigney's testimony to be credible and accepts his explanation of this event.

The IRS also relied upon the fact that Mr. Rigney filed an amended return for the 1988 tax year in December 1989. The IRS pointed out that this was done after the audit had been scheduled for January 1990. The amended return showed substantial additional income for Mr. Rigney which had not previously been claimed. Mr. Evans explained that when he was doing SRI's returns for 1988 (after he had completed and filed Mr. Rigney's personal returns), he noticed a check for which he could not account. He asked Mr. Rigney about that check and it was explained to be income from a sidebusiness Mr. Rigney was running called Homevision. Mr. Rigney said that it should have been counted as his income and asked Mr. Evans to amend the returns. Mr. Evans stated that it was only because his workload was so heavy that this was not accomplished before the IRS audit was scheduled and that it was not in response thereto. Again, the Court finds the testimony of Mr. Rigney and Mr. Evans to be credible and accepts their explanations.

Finally, in connection with the analysis of Mr. Rigney's expenditures from his personal account, the IRS asserted that the large amounts which Mr. Rigney spent each year while claiming so little income on his tax returns were proof of its position. Mr. and Ms. Rigney claimed between $25,000.00 and $35,000.00 combined gross income a year. However, the IRS points out that during that

time they purchased two Jaguar automobiles [5] and paid $175,000.00 down on a $425,-000.00 home. The IRS contends that the Rigneys' expenditures so far exceeded their claimed income that fraud must be inferred. Mr. Rigney countered that the purchases were financed by "loans" to him from SRI so that the transactions indicate huge amounts of debt rather than hidden income.

As to all of the IRS's allegations, Mr. Rigney answers, first, that no understatement of income occurred because the IRS improperly counted the "loans" as "income," miscalculated Mr. Rigney's income using the "indirect method," and misattributed payments by SRI as payments of Mr. Rigney's personal expenses. Secondly, Mr. Rigney contends that, if an understatement did occur, it was as a result of an innocent error or a mistaken understanding of the law by him and/or his accountant. Mr. Evans' testimony supports these contentions. He testified that it was his good faith belief that all items of income to Mr. Rigney were properly reported and that Mr. Rigney relied on his judgment. The Court finds both Mr. Rigney and Mr. Evans to be credible in their testimony as a whole and on this point specifically.

## CONCLUSIONS OF LAW

■ Section 523 outlines the exceptions to discharge in bankruptcy proceedings. Exceptions to discharge are to be construed strictly against the objecting creditor in order to give effect to the fresh start policy of the Bankruptcy Code. *Hope v. Walker (In re Walker)*, 48 F.3d 1161 (11th Cir.1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir.1994). Toward this goal, the objecting creditor bears the burden of proving the elements of nondischargeability by a standard of preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The IRS has claimed that the debt in question is nondischargeable under 11 U.S.C. § 523(a)(1)(C). That section provides that debts will not be discharged in a Chapter 7 case for taxes "with respect to which the debtor made a

fraudulent return or willfully attempted in any manner to evade or defeat such tax."

■ This exception to discharge has been held to apply where the IRS has established (1) knowledge of a falsehood on the return; (2) intent to evade the taxes; and, (3) an underpayment of taxes. *Kirk v. United States (In re Kirk)*, 98 B.R. 51, 55 (Bankr. M.D.Fla.1989). Therefore, what is ultimately at issue is whether Mr. Rigney knowingly filed a false return with the intention of evading taxes. Assuming, without deciding, that the IRS is correct that Mr. Rigney's returns understated his income, it has still failed to meet its burden because the evidence does not show that Mr. Rigney intentionally misreported any items of income as part of a scheme to evade his taxes.

Because direct evidence of intent to defraud is rarely available, intent may be inferred from the whole course of conduct of the debtor and may rest upon reasonable inferences properly drawn from such conduct. *Kirk*, 98 B.R. at 55. Several types of conduct have been held to be "badges of fraud" including: (1) consistent and substantial understatement of income; (2) failure to maintain complete and accurate records; (3) failure to cooperate with the IRS; (4) implausible or inconsistent behavior by the taxpayer; (5) concealing of assets; and, (6) sophistication of the debtor. *See Korecky v. Commissioner of Internal Revenue*, 781 F.2d 1566 (11th Cir.1986); *Berkery v. Commissioner, Internal Revenue Service*, 192 B.R. 835 (E.D.Pa.1996). If the IRS is correct in its audit, there was a consistent and substantial understatement of income. This, however, standing alone is not enough to show fraud in this case.

According to Mr. Rigney and his accountant Mr. Evans, the alleged understatements of income primarily resulted from their good faith belief that the transactions were "loans" and not "income." That they continued with the same method of recording and reporting the "loans" over several years bolsters the conclusion that they had no knowledge that it was anything less than proper. If Mr. Rigney and his accountant had been actively

---

**5.** One was actually the automobile of the adult daughter of Mr. Rigney. It was unclear why the

IRS would have chosen to attribute this item as income to Mr. Rigney instead of to his daughter.

scheming to hide income, surely they would have found new and different ways of doing it instead of just claiming it to be "loans" and depositing it directly into Mr. Rigney's personal account where it could be so easily traced.

As to the other badges of fraud, Mr. Rigney maintained complete and accurate books and records as is evidenced by the volume of papers submitted as excerpts of the full set. Additionally, Mr. Evans testified that SRI had adequate records for him to do his tasks. Any complaints which Mr. Rigney may have voiced in his deposition about "shoddy" bookkeeping he easily explained as his initial feeling that, if the tax returns were incorrect, it must be the fault of his accountant. An examination of the records supplied to the Court does not reveal them to be "shoddy" in the least. The IRS has not alleged that Mr. Rigney failed to cooperate or that he made any attempts to conceal assets. It has also not claimed that Mr. Rigney has any more than the average business sophistication. He is a high school graduate with two years of college work who has had no special training in accounting or tax law.

The only other badge of fraud to which the IRS points is what it deems to be Mr. Rigney's inconsistent lifestyle. The IRS claims that Mr. Rigney's purchase of the house and the Jaguar cars is so inconsistent with his reported income of approximately $30,000 a year that he must have realized that he was understating his income on his tax returns. Mr. Rigney testified that the large down payment on the house came from a "loan" from SRI which is documented on the books. The balance of the purchase price of the house was financed by the owner. Mr. Rigney subsequently took a second mortgage on the house with SouthTrust bank and turned the proceeds back over to the company. The cars were similarly paid for by "loans" from SRI.

In sum, at least in Mr. Rigney's mind, he was not living an inconsistent lifestyle because he was hiding income; he instead believed himself to be greatly in debt. As he explained it, the loans were reflected on the books of SRI and any sale of the company would have also resulted in his repaying the loans in full. Mr. Rigney understood this and planned to repay the loans from his proceeds of the sale in that event. He was simply borrowing against the future sale of the business which he thought was imminent. Because he did believe that he would sell SRI eventually for a great profit, he was not concerned about the huge amounts of debt which he was carrying. Mr. Evans testified that it was Mr. Rigney's intent to not take a large salary from SRI so that it would have a high book value and show a healthy profit margin to encourage a sale.

The IRS also tried to suggest that Mr. Rigney must have provided documentation substantiating more income in order to finance the purchase of the house. Mr. Rigney testified that the owner of the house did not require any special documentation of his personal income. SouthTrust also did not require income documentation for the second mortgage because of the amount of equity in the house. The IRS offered no proof otherwise on this point. Finally, the IRS claimed that the filing of the amended tax return by Mr. Rigney after the scheduled audit in itself shows his consciousness of his previous understatement of income. Mr. Rigney and Mr. Evans testified consistently that the income missing from the initial return which was added in the amendment was due to one check being overlooked and not to an attempt to correct a return which they knew to be in error before an audit. The missing check was discovered when the corporate returns were done and the individual return was amended accordingly. Mr. Evans candidly admitted that the amendment was not filed until later in the year because he could not complete it due to his heavy workload and not in response to the audit notice.

Because the Court found the testimony of Mr. Rigney and Mr. Evans to be credible and the explanations offered by each of them for the allegedly incorrect items on the returns to be consistent and entirely reasonable, the Court concludes that Mr. Rigney did not knowingly file a false return in an effort to evade his taxes. The testimony of the IRS agent and the representative suggests to the Court that the sheer amount of

the claimed understatement caused them to too quickly conclude that fraud was at hand.

Mr. Rigney relied on the advice of Mr. Evans that the transactions in question had been correctly reported. Reliance on a book-keeper or accountant is no defense to fraud if the taxpayer failed to provide the accountant with all of the data necessary for maintaining complete and accurate records. *Korecky,* 781 F.2d at 1569. Both Mr. Rigney and Mr. Evans agree that Mr. Rigney provided Mr. Evans with full access to all of the information necessary to complete the returns. He did not withhold records or supply incomplete or misleading ones. Accordingly, he is entitled to rely on Mr. Evans' good faith opinion about the classification of the transactions. If it turns out that the accountant's advice was in error, then that is all that has occurred—an error. There was no evidence that there was any error in handling the transactions as loans. Mr. Rigney did not knowingly file a false return. He did not intend to evade taxes he knew were owing. Because the IRS has failed to prove that Mr. Rigney knowingly filed false returns, the Court need not decide the issue of whether an understatement of tax liability actually occurred.

*Accordingly, it is hereby*

**ORDERED, ADJUDGED AND DE-CREED** that the relief sought by the Plaintiff, Joseph Rigney to declare his indebtedness to the Internal Revenue Service for the tax years 1986, 1987, 1988 dischargeable in accordance with 11 U.S.C. § 523(a)(1) is **GRANTED.** It is further

**ORDERED, ADJUDGED, AND DE-CREED** that the indebtedness of the debtor/plaintiff Joseph Rigney to the Internal Revenue Service for the tax years 1986, 1987, and 1988 is **DISCHARGEABLE** and is included in the discharge of the Debtor entered in this case by order of this Court on February 12, 1996, and a **JUDGMENT** to that effect in favor of the debtor/plaintiff Joseph Rigney will be entered contemporaneously herewith.